Whitaker, Judge,
delivered the opinion of the court:
Plaintiffs sue for overtime and night differential pay-alleged to be due them for services as firefighters at the United States Naval Base, Newport, Rhode Island. Their claims are based upon sections 201 and 301 of the Federal Employees Pay Act of 1945, as amended, 59 Stat. 295. The claims of plaintiffs herein, one hundred and eleven in number, except for travel pay, are similar, in both law and fact, to those of other firefighters recently considered by this court in Avary, et al. v. United States, 141 C. Cls. 577, and Collins v. United States, 141 C. Cls. 573.
The trial herein was limited by stipulation to the question of liability, with the amount of any recovery to be determined by further proceedings pursuant to Rule 38 (c).
Plaintiffs first claimed entitlement to pay for all time spent in eating and sleeping, while on tours of duty at their fire stations, but, at oral argument they abandoned these claims in the light of the Avary and Collins cases, supra. Remaining for consideration are plaintiffs’ contentions that they are entitled to compensation for work actually performed during time set aside for sleeping and eating, and for time spent in travel by boat to two fire stations located on islands offshore from the base proper.
During the period of the present claims, plaintiffs have been on duty for a total of 72 hours per week. Each of the three weekly 24-hour tours, comprising the 72 hours, is divided into three parts, by the regulations under which they were paid: 8 hours in a work status; 8 hours in a standby status; and 8 hours for sleeping and eating. For the first 40 hours in a work and standby status, they were paid regular rates of pay, and for the last 8 hours they were paid at overtime rates.
*311 Prior to May 23, 1953, they were paid at overtime rates for some specific types of work performed during sleeping time, but otherwise received no pay for hours set aside for sleep. It cannot be determined from the record what specific work performed during sleeping and eating time, prior to May 23, 1953, was paid for and what was not. Thereafter, they received pay for two-thirds of the total time spent at their duty stations, with no extra pay for duties performed during sleeping time. Up to May 1953 a night differential of 10 percent of basic compensation for all hours of employment between 6:00 p. m. and 6:00 a. m. was received by plaintiffs for all of such time except that set aside for sleeping from 10:00 p. m. to 6: 00 a. m., but thereafter they received differential pay for two-thirds of such hours whether sleeping or not.
The change in the method of compensation resulted from a change in the regulation of the Department of the Navy, to conform to the “two-thirds rule” for compensation of employees whose duties were irregular in time, which had previously been promulgated by the Civil Service Commission. This rule provided for pay for two-thirds of the time on duty, on the theory that the other one-third was consumed ;n sleeping and eating.
The nature of the duties performed by plaintiffs during hours set aside for sleeping are set forth in detail in our findings of fact. They include claims for two hours’ per man per tour of duty on alarm desk duty, and other miscellaneous things, such as, standing by at movies and dances on the base, removal of snow from in front of the fire houses, standing by while tankers discharged cargo, patrols, etc.
What we have said in Avary, et al. v. United States, supra, and Collins v. United States, supra, decided the same day, is dispositive of the primary claims herein. In those cases we held that time spent in sleeping and eating is noncompensable, but that time spent in actual labor during these periods is compensable under sections 201 and 301 of the Federal Employees Pay Act, supra. To the extent that plaintiffs have not been compensated for work actually performed during periods set aside for eating and sleeping they are entitled to recover.
*312 Approximately one hour of each tour was consumed in eating.[1] In addition, plaintiffs were paid night differential for two-thirds of all applicable hours after the 1953 change in regulations. Prior thereto, they had not been paid during time set aside for sleep. For ten hours out of each 24-hour tour plaintiffs were permitted to sleep, except for the period from December 1950 to August 1951, when only 8 hours were allowed. Since, under section 301 of the Act, night differential is payable only for hours of “duty”,[2] plaintiffs prior to the 1953 change have been overpaid for two hours in which they were permitted to sleep, and after that date were overpaid, under the two-thirds rule for all of such pay received for time in which they slept.
Since this case is before us only on the question of liability, proof was not adduced to show the number of hours spent by each plaintiff in the various activities listed in finding 11. A good many of them were not performed during sleeping and eating time; others occupied only a negligible amount of time. Where a substantial amount of time was spent on these duties during eating and sleeping time, such as the desk watch, for instance, plaintiffs are to be compensated therefor, but where the time spent was negligible, it is to be disregarded, under the de minimis rule.
Against the total time spent on such duties during eating and sleeping time, defendant is entitled to an offset for the number of hours over eight in which plaintiffs were permitted to eat or sleep, but for which they have been paid, as well as for all overpayments of night differential pay.
A further claim is asserted for time spent in travel by boat to and from island fire stations. Plaintiffs say that the time consumed[3] by travel in boats furnished by the Navy is *313 “employment” within the meaning of the Act. Section 201 reads in part as follows:
Sec. 201. Officers and employees to whom this title applies shall, in addition to their basic compensation, be compensated for all hours of employment, officially ordered or approved, in excess of forty hours in any administrative workweek, at overtime rates as follows: * * *
Was the time spent in boat travel to and from their duty stations hours of employment?
Plaintiffs urge that the doctrine of Tennessee Coal, Iron and Railroad Company v. Muscoda Local No. 123, 321 U. S. 590, is controlling. We do not think this case is apposite. It was there decided that dangerous underground travel by iron miners to and from mine workings wholly within the mines, in cars furnished and operated by the mine owners and under their supervision and control, was compensable under the Fair Labor Standards Act.[4] The miners checked in at the opening to the mine on the surface of the ground; from there they were required by the owners to ride in ore cars or other cars to a platform about two miles from their place of work and to walk the rest of the way. This journey from the checking in place, all on the owner’s property, was a necessary incident to their employment.
The facts of this case are quite different. The trip here was not exclusively on the owner’s property; it was made before reporting for work; it was not required by defendant, although it was the only way they could get there, and it involved no more risk than the travel to and from work performed by any employee. The Supreme Court distinguished that case from a prior decision wherein pay was denied for travel by motorboat furnished by the employer to the work site.[5] We think the time spent in this travel is no more compensable than the time spent by any employee in going from his home to his work.
Finally, defendant asserts laches as a defense. We cannot sustain this contention for the reason that no showing has been made that defendant has been damaged by delay on the part of plaintiffs. Ordinarily, a plaintiff has the full *314 statutory period within which to bring his action. Only an aggravated case of unreasonable delay, with notice of the damage being caused the defendant thereby, can deprive a plaintiff of the full statutory period within which to bring his suit. See Poggas v. United States, 118 C. Cls. 385, 410.
Defendant relies also on the Act of September 1, 1954 (68 Stat. 1111; 5 U. S. C. 926), which allows a lower rate of premium pay for employees such as firefighters, who are required to remain at their post of duty in a standby status. This Act has no application to plaintiffs by reason of subsection (b), which provides that it shall not decrease the' aggregate compensation of any employee then on the payroll.
Plaintiffs are entitled to recover, and judgment will be entered to that effect. We remand the case for further proceedings pursuant to Buie 38 (c), for determination of the amount due plaintiffs, if any, after appropriate offsets, as herein set out.
It is so ordered.
Laramore, Judge; Madden, Judge; Littleton, Judge, and Jones, Chief Judge, concur.
findings of fact
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiffs are all citizens of the United States. J. J. Menczywor sues as administrator of the estate of Peter J. Menczywor, deceased, and Alice A. Surprenant sues as administratrix of the estate of Armand A. Surprenant, deceased.
2. By stipulation of the parties, approved by the Commissioner, the trial of this case was limited in the first instance to the issues of law and fact relating to the right of the plaintiffs to recover, reserving determination of the amount of recovery and of defendant’s counterclaims for further proceedings, if necessary. Accordingly, this report deals only with facts relating to the right of plaintiffs to recover.
3. For various periods of time during the six years prior to the filing of this petition on August 26,1955, the plaintiffs *315 were' employed by defendant as firefighters at the United States Naval Station at Newport, Rhode Island.
They seek to recover overtime compensation for the respective periods of their employment within the period subsequent to September 1, 1949, pursuant to the provisions of section 201 of the Federal Employees Pay Act of 1945, 59 Stat. 295, as amended, and extra night pay differential pursuant to the provisions of section 30Í of that statute.
4. By agreement of the parties it was determined that it would be unnecessary to present evidence in detail as to each individual plaintiff but that one witness would be called to cover the nature of plaintiffs’ work in general at all of the fire stations at the base and one witness would be called to testify specifically as to the facts and circumstances relating to each of the separate stations. At the conclusion of plaintiffs’ evidence it was stipulated that the evidence presented by the witnesses offered was a relatively representative cross section and if all the other plaintiffs were called they would testify substantially to the same effect as the witnesses who had testified as to tours of duty, the nature and amount of work performed, the character of the station houses, and the opportunities for sleeping and eating.
5. The Newport Naval base and its component parts extend along the side of Narragansett Bay from what is known as Melville to a point at the southern end of the city of Newport known as Fort Adams. The entire base is about 11 miles long and varies in width from about three-quarters of a mile at the widest point to 200 feet at the narrowest point. As of July 1,1956, the total area was 2,621 acres with approximately 1,300 buildings placed there, having-a total original cost of about $38,000,000. The military population on the base, excluding fleet transients, was about 7,800; fleet transients about 11,000, and civilian population about 3,500. In one area of the base known as Melville are located the net depot, the fuel depot, fuel storage tanks, including tanks for jet aviation fuel and supply buildings. In the same general area are a swimming pool and about 300 trailers which house military personnel. Also in this area are large docks at which craft such as destroyers, destroyer tenders and oil and fuel tankers are frequently anchored.
*316 The underwater ordinance section of the base which deals with experimental work on war-heads and torpedoes is located near the Melville area. A number of underground storage facilities for torpedoes are also in this section. Adjoining the underwater ordinance section is a very large naval supply depot where vast quantities of food and other such supplies are stored. The firefighters have responsibility for furnishing fire protection for all of the property and people on the base including the fuel and oil stored at this base or in ships or tankers in the adjoining bay.
Fire prevention activities were emphasized as distinguished from fire fighting. As a result, fire prevention duties such as inspection and adjustment of fire extinguishers, watch duty at all places where fire might start and building inspections after each use of certain buildings was disproportionately high and actual fire fighting correspondingly low in comparison with duties of the usual city fire department.
At the time of the trial of this suit there were eight separate fire stations on the base in addition to a central fire alarm center. These sections varied in number of men and the amount of equipment. Firefighters are on duty at each of the stations continuously.
6. During all periods herein pertinent the administrative work-week at the Newport base was 40 hours. The plaintiffs were required to be on duty 72 hours each week. This was divided into three 24-hour shifts, each commencing at 8 o’clock a. m. and continuing until 8 o’clock a. m. the following day. Plaintiffs were paid primarily under the so-called two-thirds rule pursuant to which each hour on duty is regarded as equivalent to two-thirds of an hour of working time. On this basis the period of 72 hours was reduced to 48 hours for pay purposes. The 8 hours of this period, in excess of the 40-hour work-week, has been paid for as overtime. Night differential compensation has likewise been allowed under the two-thirds rule.
The fire department is organized with a fire chief, three assistant chiefs, and sixteen captains. As of the date of trial there were 20 driver-operators and 62 firefighters. This organization has existed since the consolidation of the fire *317 departments in 1950. The fire chief has usually worked a 48-hour or 56-hour week, at one time composed of 4 days of 10 hours each and 1 day of 8 hours, and subsequently of 4 days of 8 hours each and 1. day of 24 hours. The other members of the fire department have each had three 24-hour tours of duty each week during the period covered by this claim, with the exception of temporary assignments to special duties, not now material. The 24-hour tours of duty are from 8 a. m. on one day to 8 a. m. the following day.
7. All of the fire stations at Newport were equipped with dormitory facilities, either adjacent to the area where the fire equipment was stored, or on the floor above it. Each of the stations also had cooking facilities furnished by the Navy. These were used to some extent by the firefighters in preparing their own meals with food purchased by them. However, they also had, at most stations, permission to use nearby military messes. They ate two meals during each tour of duty, one at noon and one in the afternoon, plus “coffee breaks” at other times. Each meal took from 20 to 30 minutes, or possibly a little more if a man prepared his own meal. Each station had a TV set and a radio set provided by the men at their expense. There were also chairs for lounging. Some stations had a ping-pong table. The firefighters were free to use these facilities, or to read or play cards, when there were no specific duties to be performed. The record does not establish with accuracy the average time available for relaxation, but it appears to have approximated 6 to 8 hours a day, although during such periods they were still at the station and in a stand-by status insofar as any emergency calls were concerned.
8. On December 5, 1950, written orders were issued at the Newport base that beds in the dormitories in the fire stations could not be occupied between the hours of 6 a. m. and 10 p. m. On August 21, 1951, these orders were modified so that the firemen could occupy their beds at any time between 8 p. m. and 6 a. m. There is no evidence as to the exact situation which prevailed on the base between September 1, 1949, and December 5, 1950, with respect to hours of sleep. These orders were complied with, so far as the duties of the firefighters permitted.
*318 The record indicates that there were relatively few fire alarms that interrupted the firefighters between 10 p. m. and 6 a. m.; during 1953 there were only 24 fire alarms during this 8-hour period, which kept the engines out of their stations an aggregate of 7 hours and 25 minutes. In 1954 there were 27 alarms for a total time of 8 hours and 4 minutes, and in 1955 there were 20 alarms involving a total time of 6 hours 22 minutes. Some stations had a greater frequency of alarms than did others, but for all eight of the stations at the Newport base there were an average of two night alarms (between 10 p. m. and 6 a. m.) per month, with a monthly average of 36 minutes per alarm. Such interruptions were definitely infrequent occurrences when computed on the basis of an individual firefighter. However, the evidence shows that when a general alarm is sounded all firefighters are awakened and required to make ready to report for duty at the location involved. They had to remain in such status until it was determined how many stations or individuals must actually participate in answer to the call.
9. During a typical 24-hour shift plaintiffs would report to work at 8 o’clock in the morning, change clothes (they were required to be in uniform while on duty), perhaps have a cup of coffee, and receive assignments to their respective duties. An important duty assignment is that of the driver-operator of apparatus. The driver’s first job would be to inspect the apparatus to insure that it was in proper working order, with ample supply of oil and gasoline. He would clean and polish the brass and check all the equipment. This work required the major part of the morning. Other things which had to be done during the forenoon included routine housework and building inspections. At noon, 20 minutes to one-half hour would be taken for lunch. During the afternoon the firefighters engaged in fire prevention activities which included building inspection and inspecting and refilling fire extinguishers. There was always work of that nature since it was not possible to keep up to date with the required inspection schedule. In addition there might be one or more calls to fires, some fire drills and area patrols. The area patrols were usually accomplished after the evening meal and were a daily occurrence, taking the time of one man *319 for about 1 hour each day. There were special duty assignments when tankers were at the dock. These included helping tie the tankers, connecting hoses, setting up emergency firefighting equipment, and standing by on watch until the tanker had loaded or unloaded and departed. A desk watch was maintained on a 24-hour a day basis. This was rotated on 2-hour shifts among the 5 or 6 men assigned to the station so that each man served at least two of these 2-hour desk watch shifts, and some had more than two, during each 24-hour tour of duty, except that sometimes the captain would take the desk watch during his 8 hours of daytime duty, but each man had at least one of these 2-hour watches between the hours of 10 p. m. and 6 a. m. on each tour of duty. Such work could continue through the afternoon until time to eat again when approximately 30 minutes would normally be taken for the evening meal, ending about 6:30 p. m. After 6:30 p. m. if there was nothing special to do, such as an area patrol, a special watch or other special duty, they could relax, watch television or listen to the radio until about 10 o’clock p. m. when they were allowed “to turn into bed” until 6 o’clock the next morning, subject every night, however, to being called for a 2-hour desk watch and subject further to being called at any time for fires or other emergencies. They were able to get a maximum of 8 hours sleep and rest combined each night if there was nothing else to do. Often the actual amount of sleep would be from 5 to 7 hours or less. On very rare occasions some of the men got practically no sleep from 10 p. m. to 6 a. m. During part of the 6-year period covered by this suit the desk watch required the person on duty to be awake and sitting at the desk at all times. During the other portion of the period a so-called “sleeping watch” was permitted between the hours of midnight and 6 o’clock a. m. On this watch the person on duty was permitted to lie on a cot or bed beside the desk, but he was responsible for answering all calls, whether personal, telephone or fire alarm. The actual number of calls during this 6-hour period would be as many as two or three on some nights, with sometimes one and sometimes none. The calls would usually awaken not only the person on desk *320 watch, but all men in the station whose sleeping quarters were near the phone and alarm bells.
10. The duties varied to some extent from station to station among the eight stations on the base, some being more active than others. However, pursuant to a system of rotation now in effect, the plaintiffs are moved from station to station periodically so that, in actual practice, each one has served or will serve at each of the several stations. Although different areas had different problems, in the main the duties were very similar. The tanker watches were generally the responsibility of Station 9, at Melville. Movie watches and securing of public buildings after use could be assigned to most any of the Stations except Station 1. Station 8, known as Prudence Island, and Station 7, known as Gould Island, required about 25 hours of duty each shift instead of 24 since they were reached by boat which departed the main base at 7: 30 in the morning in order to reach the island by 8 o’clock and returned to the main base at 8:30 o’clock the next morning so the men could complete their full 24 hours at the station ending at 8 o’clock. Station No. 4, Fort Adams, had a minimum of special watches such as tanker watches and movie watches. There was no distinction between the duties of the firefighters who were on watch duty in the daytime, and those who were required to be on watch duty from 10 o’clock p. m. until 6 o’clock a. m.
11. The following are specific duties which, during the period covered by this suit, the plaintiffs were required to perform or be available to perform when occasion demanded between the hours of 10 o’clock p. m. and 6 o’clock a. m. ■
(1) Area fatrol: This is patrolling a particular area, as per special assignment, looking for such things as fire hazards, defective alarm box lights and road obstructions. This was usually accomplished during daylight hours.
(2) Ins feet and secure bmldings: This duty related primarily to enlisted men’s and officers’ clubs and other places for public gatherings, such as movie theatres or buildings where dances were held. This work was always in the evening after people had left the buildings for the night. It required inspection to detect and remove cigarette and cigar butts, trash or other fire hazards. This final inspection *321 and removal of fire hazards was called “securing the building.” After the crowds left, the buildings were secured at hours ranging from about 9 p. m. to 1: 30 a. m. There were five buildings which had to be “secured” every night.
(3) Movie watches: Whenever a movie is held on the base a fireman is assigned to stand by while the show is in progress. This service was required for each of four theatres and the duration of such assignment depended on the length of the movie, usually ranging from one and one-half to two and one-half hours.
(4) Night drills; These have not been frequent during a period of about 18 months prior to December 1956. Before that period, beginning in 1949, a number of these drills were held and they generally occurred after midnight. A drill consisted of the sounding of an alarm, and complete response by the men who were to participate. They performed various duties such as taking out equipment, connecting hoses, pumping water and placing ladders, to fully simulate actual fire fighting. Upon return to the station after such a drill, all equipment was cleaned, used hose placed on racks to dry and fresh hose placed on the trucks. An actual drill would consume 20 to 25 minutes and cleaning the equipment after return to the station would consume about 1 hour. No specific evidence, showing how many times per month or year the drills took place, was put in the record.
(5) Air raid warning tests: These were started about 1953. They would occur day or night, sometimes 2 or 3 times a week; other weeks there would be none. When they came at night they would awaken those in the station house.
(6) Accidental and false alarms: These alarms require the men to respond as if for actual fire fighting. No statistics have been furnished with regard to the frequency of these alarms which happen both during the day and at night.
(7) Dcmce stand-bys: These required a fireman to stand by throughout any dance on the base and he had to secure the building after the people had departed, which was usually about 1 or 1:30 a. m.
(8) Inspection of leaky hydrants: This was done occasionally, but the record does not show that any such inspection interfered with eating or sleeping time.
*322 (9) Changing fire extinguishers: There are a great many of these on the base. They are inspected on a monthly basis and recharged and overhauled on a yearly basis. This is done primarily as routine during day-time hours. Replacements at night would be very infrequent and only in emergencies, such as when an extinguisher is tipped over or when someone discharges the C02 from them to cool their drinking water or for some other purpose.
(10) Snow removal: In every case of snow at night the firefighters were required to keep the doors and driveways clear to make sure the apparatus could get out when necessary. This occurred 3 or 4 times each winter. If the snow storm occurred at night it would have to be removed at night. No definite information as to the frequency of removal of snow at night was offered.
(11) Washing down oil spills: This was required mostly around Station 9, Melville, near the docks where tankers unloaded and the oil and fuel storage tanks at the fuel depot. Whenever an oil tank truck or oil pipe leaked or for any other reason oil was spilled, firemen were required to immediately attach a hose and wash the oil down the sewer. This is for the protection of very large amounts of oil and gasoline involving not only oil tankers at the dock but also very large storage tanks at the Naval base with a capacity of millions of gallons. The record does not show how often this occurred at night.
(12) Fire alarm watches: This is the watch at the central alarm station. It requires that at least one person be awake and on duty at all times.
(13) Relocations: When apparatus is called from one or more particular locations for actual fire fighting or other emergency duty, it is replaced during absence from its own station by apparatus from other stations to insure that no station is without personnel and equipment at any time. Thus a call requiring only one station to respond would nevertheless call one or more other stations to auxiliary duty.
(14) Checking broken water mains: Whenever water mains are found to be cracked or broken, a report is made to the fire department and firefighters are assigned to inspect and either take action or arrange to have appropriate cor *323 rective action taken. This usually occurs during the winter months but has not occurred more than 2 or 3 times a year.
(15) 0leaning and cheeking apparatus: This is required whenever any piece of apparatus returns from any trip out of the station. Vehicles are thoroughly washed, including the under carriage, all hose used is washed and fresh hose placed on the truck; oil, gasoline and tires are checked. This normally takes about an hour. If salt water has been used it will take longer, about an hour and a half, and there have been occasions of particularly bad fires when this work has taken considerably longer to clean and put the equipment back into the required condition of readiness. This checking and cleaning work has been done about once each week but the evidence does not show how often it has been done from 10 p. m. to 6 a.'m.
(16) Pwm/pmg out trenches, basements, and sinking boats: Throughout the base there are a number of steam trenches, pipeline trenches and other trenches which become flooded during heavy storms. Firefighters are required to pump the water out of them. ' Also, firefighters have been required to pump water from flooded basements and from sinking boats. Service of this nature has been required about 15 or 20 times during the course of each year but the record does not definitely establish how often this type of duty was performed at night.
(17) Disasters: These occur very infrequently. Typical of them was a hurricane in 1954. The firefighters responded under the mutual aid agreements to assist in the neighboring cities. This was a round-the-clock service. Overtime compensation was paid in such emergencies only to those who continued on duty longer than their respective scheduled 24-hour tours and for the time worked in excess of a continuous 24 hours.
(18) Stray blows on the alarm system: These are single rings of the alarm caused by electrical disturbances or malfunctioning of the system. All personnel are required to respond as if for an actual alarm and remain in readiness until it is determined that it is not an actual alarm. This had happened at night but the frequency of such occurrences is not established.
*324 (19) Tanker watches: These are required continuously while ocean-going tankers are tied at the dock taking on or discharging cargo at the fuel depot. Upon advance notice of the arrival of a tanker, firefighters are assigned to prepare for its arrival and stand watch while it is there. Appropriate fire protection equipment must be installed at the dock such as hose, pumps, generators, lights. From 1949 to about December 1955 two firefighters were required to stand watch, in alternating 2-hour shifts around the clock, until the tanker departed. Sometimes, since that period, only one firefighter has been used after the apparatus is taken to the dock and set up. This may be for a period of 24 to 30 hours. On occasion three or four tankers will come in with very short intervals between their arrival time. Sometimes their dates of arrival are spaced as much as 2 weeks apart.
(20) Tower watches: These only occurred at Station 9, which station overlooks the docks and the fuel and oil storage area. They are similar to a deck watch at the other stations except that the watchman in such instances is stationed in a tower atop the station house. He has binoculars and other special observation and reporting equipment to observe and report happenings all over the base. This is a 24-hour watch, broken into 2-hour shifts.
(21) Pumping -flooded, tanks: Frequently the large oil and fuel storage tanks in the so-called “tank farm” became filled or partially filled with water. Firefighters were required to pump the water out. This would happen about 20 times during the course of a year. In connection with one of these jobs the operation was continued night and day until completed. The time required for some pumping jobs varied from several hours to a week.
(22) Night fires at the dump: These have occurred infrequently, but whenever they have occurred firefighters have been assigned to put out the fire. These occurred about 4 or 5 times a year.
(23) InstaZlmg tire chams on pick-up trucks a/nd fire apparatus: This work is required to be done whenever snow or ice conditions make it necessary, day or night.
*325 (24) Checking tires on fire apparatus: This was required to be done once each hour around the clock. This was one of the duties of the man on the desk watch and did not interfere with the eating and sleeping hours of other firemen. It was discontinued at night about the end of 1955.
(25) Operation of fire boat: This was an improvised piece of fire apparatus with a portable pump which was operated from 1949 to 1954 for trips to and from Prudence Island. Firefighters were frequently required to pilot this boat.
(26) Supplying drinking water to Naval vessels: This was a service required of firemen at all hours, as the need arose. When required this type of detail could involve work for a period of several hours.
(27) Assisting -fire alarm electricians: When alarm equipment got out of order it was necessary to call firemen in to demonstrate the faulty operation to the electricians. This occurred at night about one time each month.
(28) Pumping water for construction contractors: Firemen were required to be available at all hours, to pump water for contractors doing construction work on the base but the record does not show how much time, if any, was spent on such duty between 10 p. m. and 6 a. m.
(29) All night stand-by duty: After serious fires or explosions or other such occurrences it would be necessary to leave one or two men for general overhaul operations and merely to see that the fire did not break out again.. This could happen at any time but no statistics or record concerning the time or frequency of such an occurrence was put in evidence. The record does not establish any specific instance of an “all-night stand-by” required because of a serious fire or explosion.
(30) Pumping detail at Lawton’s Yalley: In periods of drought the water supply at the base was supplemented by a pumping operation from reservoir in Lawton’s Valley. This would be an around-the-clock operation over a period of 2 or 3 weeks. During this operation every man at the station would get at least one shift of 1 or 2 hours on this pumping detail. This has occurred but no definite evidence was produced to show how often this occurred during the period covered by this suit.
*326 (31) Alarms: Every alarm sounds in every station regardless of which station is required to respond. The men in every station must get up, if in bed, and be ready to go out until it is determined whether they have to go. The alarm awakens everyone in the station. Such occurrences ranged from none per week to 2 or 3 times per week between the hours of 10 p. m. and 6 a. m.
(32) Assisting in tying tankers to the dock in the Melville area: This was an emergency duty and could be required of firefighters in the absence of the dock crew. No statistics were put in evidence to show when or how often this duty was performed.
(33) Checking sprinkler systems and protective alarms: Pressure surge or other malfunctioning of the sprinkler system sounds an alarm in the fire stations. Firefighters are required to respond to such alarms to ascertain the trouble. This has occurred between 10 p. m. and 6 a. m. but no records were presented to show how often it happened, how much time was involved or how many men responded.
(34) Operating cmxiliary generators during power shortages: Firefighters have on occasion been required to operate auxiliary power generators at night for supply of electric power at the base during power shortages. But no evidence to establish the frequency of such occurrences, or the number of men who actually performed this duty, was offered.
12. Among the special duties for which plaintiffs were subject, to call at any time, in addition to fires and other emergencies on the base, were those of responding to fires and other emergencies under mutual-aid agreements, in the cities of Newport, Middletown, Portsmouth, North Tiverton, South Tiverton, Little Compton, Fall Kiver and Bristol. Emergencies other than fires in these surrounding cities for which plaintiffs were subject to call and some of them actually called, were airplane crashes, auto accidents, tornado and other natural disasters.
13. During the period covered by this suit the firefighters at the Newport Naval base have been required to paint the station houses “from top to bottom” and on a touch-up basis to paint the fire apparatus in the respective stations. Also, *327 plaintiffs were required to keep the respective station houses in order regularly each day. This included routine housekeeping in addition to scrubbing and waxing the floors, cleaning windows and repair and maintenance of housekeeping facilities. This service required from one and one-half to 2 hours of work for two of the men each day at each station and was usually done the first thing in the morning unless emergency duties arose. In other words these duties were normally a part of the duties of the job during daylight hours.
A special type of duty was required at the central fire alarm station. A watch was required on a 24-hour basis since it was the duty of the individuals on this watch to receive all calls of every character, to relay them to the respective stations and to have control of dispatching personnel and equipment to specific emergency areas including the relocation of equipment. In addition, those on duty at this central station were required to do their regular tour of building inspection. Thus, one 24-hour tour of duty during a typical week at the central fire alarm station where the men worked in groups of three, would be substantially as follows:
After reporting to work at 8 a. m. there would be an 8-hour tour of building inspection concluded at 4 o’clock p. m. This would be followed by a 3-hour watch on the alarm board until 9 p. m. Between 8 a. m. and 9 p. m. relief was granted for a noonday meal and an evening meal. At 9 p. m. such time as was necessary for writing up the day’s reports of building inspections would be utilized. After these reports were completed, it was permissible to go to bed. At 1 a. m. there would be another 3-hour duty on the alarm board until 4 a. m. Thereafter, sleep was permitted until 6 o’clock a. m. and the period from 6 until 8 o’clock a. m. could be used for dressing, washing, shaving, making up the bunks and getting breakfast. This type of day could result in as little as 4 hours sleep. During this tour each of the three men would also be subject to call for fires or other emergencies except during the 8-hour period which each one had at the alarm board. The sleeping conditions at the central fire alarm station were not good because of the large number of phone *328 calls and alarms which came in and because the sleeping quarters were within easy hearing distance of the central alarm board. This 24-hour day was varied to the extent that the alarm board duty might begin at 8 o’clock in the morning with the inspection duty and subsequent alarm board duties at varying hours, but the total amount of time spent would be approximately the same upon any variation of the schedule for the 24-hour day outlined in this finding. The other two periods of 24 hours each, which completed the so-called typical week at the central fire alarm station, would be so arranged that there was opportunity for as much as 8 hours for sleeping.
14. In addition to the foregoing, plaintiffs, or some of them, were called upon periodically during the time covered by the suit in this case for certain unusual services. During approximately a year of the time covered by the claim in this suit, there was a special arrangement between the fire department and the medical department for use of firefighters as emergency ambulance drivers, in connection with sickness and injuries wholly unrelated to the fire department work. During the same period, firefighters were frequently called to the sick bay to assist with such things as artificial respiration and the use of resuscitators. During the same period of about 1 year ending in 1950, firefighters were frequently detailed, usually in the evening, to give demonstration and instruction courses at near-by city fire stations. It would frequently be midnight or 12: 30 a. m. before they returned from this duty.
15. During the period here in question there was a regulation applicable to the plaintiffs, stating that “when an employee is placed in a stand-by status he is placed in a duty status which under the decision of the Supreme Court, 323 U. S., is subject to compensation”. During a portion of the 6-year period covered by this suit, extra compensation was paid for certain night calls. If such a call kept the men on duty for more than 30 minutes they received extra pay for 1 hour. If less than 30 minutes no extra pay was allowed. This was true only as to calls for actual fire-fighting, but the time for cleaning the equipment after returning from the fire and for tanker watch was not counted for *329 purposes of extra pay. Mr. Emmett Tobin of the Office of Industrial Relations of the Navy Department wrote the regulations covering firefighters in 1953 and the regulation issued on February 17, 1955. In drafting the regulations, Tobin attempted to follow the reasoning of the Supreme Court in the cases of Armour & Co. v. Wantcock and Swift & Company v. Jim Skidmore.s
16. At the time of the trial the personnel of the fire department, United States Naval Station, Newport, R. I., consisted of approximately 107 persons attached to 8 stations and one fire alarm center within the area comprising the naval station. The number on active duty in the individual stations varied according to the size and requirements of the facility. During the period with which this litigation is concerned, members of the fire department have been shifted from station to station as the exigencies of the service required. Since the month of December 1955 this rotation was systematized with the result that each member of the department, including the plaintiffs, is transferred from one station to another every 7 months. Since September 1, 1949, each of the plaintiffs has had a work-week consisting of 72 hours divided into 3 shifts of 24 hours each, commencing at 8 a. m. and continuing to 8 a. m. the next day. During all of the 72 hours comprised within the work-week, plaintiffs were required to remain at their posts in the performance of active duties or on a stand-by basis. Although the plaintiffs are not all in the same grade, the extent and character of work performed has been substantially the same in all grades.
17. As of September 1, 1949, the beginning date of the claims involved in this suit, Navy Civilian Personnel Instructions applicable to the employment of civilian firefighters at Navy posts and installations provided as follows:
SECTION 2, HOURS OF WORK
2-1. GENERAL Statement and Policy.
íjí -1* í¡i
6. Field Service workweek. — The basic workweek comprises 40 hours — 5 days of 8 hours each normally Monday to Friday, inclusive. See also NCPI 85.5.
*330 (2)Exception-firefighters. — Firefighters will be worked oil a two-platooii system, 24 hours on and 24 hours oil, with sufficient men in each platoon so that each individual will work three shifts of 24 hours per week, or 48 hours subject to pay. * * *
SECTION 3. OVERTIME COMPENSATION, ADDITIONAL COMPENSATION — PER ANNUM EMPLOYEES
$ $ ‡ ‡ $
3-4. Detailed PsovisioNS.
‡ $
j. On-call employees. — On-call employees are those who are required to remain at or within the confines of a designated post of duty for more than 40 hours per week for the purpose of rendering service, but who are not required to devote all of their time to actual work.
(1) Employees in the firefighter group will be worked on a two-platoon basis, 24 hours on and 24 hours off, with sufficient men in each platoon to permit the arranging of shifts so that each employee (including supervisors) will work 48 hours per week. In exceptional cases, firefighters may be employed on a three-shift basis of 40 hours per week. See NCPI 85.2-le (2).
(2) Pay is computed on a weekly basis, not on the basis of the average weekly hours over a cycle (25 Comp. Gen. 205; B-51619 of 20 August 1945). Overtime is payable for work beyond the 40-hour basic workweek, except that for duty in excess of 40 hours per week, compensatory time off may be granted when requested by the employee (NCPI 85.6).
(3) Employees will not be paid for time allowed for meals and sleeping. Time allowed for meals and sleeping will be excluded for purposes of computing overtime compensation or compensatory time off.
(4) Where employees are on a 24-hour-on, 24-hour-off system, 8 hours of each 24-hour-on shift shall be allowed for meals and sleeping. If an emergency arises which requires that part of this 8-hour period be devoted to work, local commands may permit such time to be counted for overtime purposes, or at the request of the employee, may allow compensatory time off from duty where the total hours of employment per week exceed 40.
# * * * *
h. Night work — additional pay. * * *
*331 (6) On-call employees on a 24-hour-on, 24-hour-off system, are entitled to receive the extra night work pay for those hours of a regularly scheduled tour of duty which fall between 1800 and 0600, except that they are not entitled to any pay whatsoever for the hours devoted to sleeping and eating. See also NCPI 85.3-4f. •fc
This system of compensation, which had been followed by the Navy since 1945, divided each 24-hour tour of duty into three equal parts, one work time, one stand-by time, and one eating and sleeping time. The first two segments were treated as working time but the third was not; however, any emergency services performed during the hours set aside for sleeping and eating were considered to be hours of work for purposes of compensation. The firefighters at Newport were in fact paid overtime compensation for some specific types .of work performed during the hours set aside for sleeping and eating during the period this regulation was in effect.
18. As a result of a protest over this procedure by the General Accounting Office, which objected to any payments in excess of those which would be payable under the so-called “two-thirds” rule, the Navy amended these regulations on May 28, 1953. So far as they related to firefighters, these regulations provided as follows:
SECTION 4. SHIFT WOKK
4 — 3. “Oh-Call” Employees. — “Qn-call” employees may be graded and ungraded employees, such as firefighters and certain ship maintenance mechanics who provide protective and other services. Their nonover-time workday is in excess of 8 paid hours, and their daily tour of duty includes hours during which no active work is performed, but during which they are required to remain in a stand-by status within a designated area, ready to perform active work on call.
a. Two-platoon system. — For reasons of efficiency and economy, firefighters and other “on-call” employees are generally worked under the “two-platoon system.” Each platoon is “on” 24 hours and “off” 24 hours. Sufficient men are provided each platoon so that each man is “on” two consecutive 12-hour periods three times a week. Two-thirds, or 8 hours of each 12-hour period is credited as pay time, and one-third, or 4 hours, is non- *332 pay time allowed for sleeping and eating. Of the 72 hours the employee is on duty during the administrative workweek, 48 hours constitute pay time, consisting of 40 hours straight time and 8 hours overtime, and night pay time.
o. The 21¡.-hour on duty period. — Although the 24-hour on duty period may be scheduled as a single workday, it is preferable that the 24-hour period be scheduled as two 12-hour workdays, for ease and accuracy of accounting and equity in holiday benefits. For example, a period from 0800 Monday to 0800 Tuesday may be scheduled as a single workday, although it is preferable to schedule the period from 0800 to 2000 Monday as Monday workday and the period from 2000 Monday to 0800 Tuesday as Tuesday workday. (32 Comp. Gen. 191; B-112142 of 17 Oct 1952.)
o. ’Bly-hour workday.- — -When the 24-hour on duty period is scheduled as a single workday, the workday may be divided into “worktime,” “stand-by time,” and “sleeping and eating time,” and pay credited for 16 hours of work and stand-by time. No pay is creditable for “sleeping and eating time” even though active work may be performed during the hours devoted to sleeping and eatmg. The two-thirds rule may be applied to the single 24-hour workday by crediting two-thirds of each hour of the 24-hour period (16 hours) as pay time and one-third of each hour of the 24-hour period (8 hours) as sleeping and eating time.
d. 12-hour workday. — -When the 24-hour on duty period is scheduled as two 12-hour workdays, two-thirds of each hour of the 12-hour period (8 hours) is credited as pay time and one-third of each hour of the 12-hour period is non-pay or sleeping and eating time.
e. Two-thirds rule explained. — The two-thirds rule is applicable to graded and ungraded “on-call” employees. Two-thirds of each hour on duty is credited as pay time. Two-thirds of the first 60 hours on duty, less one-third or 20 hours sleeping and eating time, is regarded as the basic 40-hour workweek. The straight time payable during the basic workweek is two-thirds the hourly rate of pay for each of the first 60 hours on duty. Night work pay is computed on the basis of two-thirds of the hourly rate for the hours of the workday during which the differential is payable. Overtime is credited at two-thirds the hourly overtime rate for the overtime hours of the scheduled workweek. Holiday premium pay is credited at two-thirds the hourly premium rate for a 12-hour workday. Leave is charged at the rate of two- *333 thirds of an hour for each hour of absence. Total charge for leave may not exceed 40 hours in any one administrative workweek. (NCPI 105 “Leaves of Absence.”)
/. Two and three shift operation. — Where it is impracticable to employ the two-platoon system, activities are authorized to use two and/or three shifts to provide the services needed.
There were various changes in the language of this regulation between May 28, 1953, and October 22, 1954, but such changes have not altered its substance.
19. Pursuant to the Federal Employees Pay Act of 1945, 59 Stat. 295; as amended, 60 Stat. 216; 68 Stat. 1105, 1111, and regulations issued by the Civil Service Commission and rulings of the Comptroller General issued thereunder, the Navy Department amended its regulations to provide in material part as follows:
SECTION 4. SHIFT WORK
$ $ $ $ ‡
4-3. ON-Call Status. — By reason of the provisions of Section 401 of the Federal Employees Pay Act of 1945, as amended, a distinction is made between “on-call” and “standby” in the regulations of the Civil Service Commission and in this Instruction.
a. “On-eall” defined. — “On-call” means being subject to call to work during hours outside the scheduled workweek and during other periods when in a non-work status. A majority of graded and ungraded employees are on-call employees within the meaning of this definition, and are in an on-call status during their non-work hours.
* * * * *
4-4. StaNdbt Duty. — When an employee is placed in a standby status he is placed in a duty status which, under decisions of the Supreme Court (323 U. S. 126), is subject to compensation. As here used, “standby status” and “standby duty” are synonymous. Both mean “work” for pay purposes, whether the employee sleeps or idles away his time while awaiting a call to perform actual work. An affirmative order by competent authority is necessary to place an employee on standby duty. Call-back overtime is not payable to *334 employees on standby duty when called to perform actual work.
j. “Standby” defined. — “Standby” means remaining, on orders from competent authority, at or within the confines of a duty station or designated area, in a state of readiness to perform actual work when the need arises or when called.
Jfr % # * *
4-5. Regular StaNdby Duty. — Section 401 (1) of the Federal Employees Pay Act of 1945, as amended, provides that an employee in a position requiring him regularly to remain at or within the confines of his duty station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing actual work, may receive premium compensation for such duty on an annual basis in lieu of premium compensation provided by any other provisions of the Act. The premium compensation is determined as an appropriate percentage (not in excess of 25 percent) of such part of the rate of basic compensation for any such position as does not exceed the minimum scheduled rate of basic compensation provided for grade GS-9 in the Classification Act of 1949, as amended, by taking into consideration the number of hours required in a standby status, the extent to which the duties of such position are made more onerous by night or holiday work, or by being extended over periods of more than 40 hours a week, and any other relative factors.
a. Department of Defense policy with respect to firefighters. — It is the policy of the Department of Defense that the provisions of Section 401 (1) and the regulations of the Civil Service Commission applicable thereto be applied uniformly throughout the Department of Defense to firefighters.
5. Defimtions. — “Standby status” and “duty station” are defined in NCPI 85.4-4. “Regularly required” is defined as a requirement that recurs with sufficient certainty to be included in the workweek schedule, even though it is intermittent and occurs on days that differ from week to week. “Longer than ordinary tours of duty” are defined by the Civil Service Commission as tours of duty exceeding 40 hours a week. “A substantial part of which consists of remaining in a standby status rather than performing work” refers to the entire weekly tour of duty. This condition exists when:
(1) A substantial part of the whole period of duty, *335 at least 25 percent is spent in a standby status which occurs throughout the entire tour of duty.
(2) Certain hours of the tour of duty are regularly devoted to actual work and others are spent in a standby status, that part of the period of duty devoted to standby is at least 25 percent of the entire period of duty.
(3) An employee has a regular 40-hour basic workweek requiring full-time performance of actual work and is required, in addition, to perform standby duty on certain nights, or to perform standby duty on certain days not included in the basic 40-hour workweek.
c.Percentage premium rate. — The percentage premium rate is fixed by the Civil Service Commission. The rate varies from 5 percent to 25 percent of such part of the rate of basic compensation of the position as does not exceed the minimum scheduled rate of basic compensation provided for grade GS-9 in the Classification Act of 1949, as amended. The basis on which the rate varies is the number of hours of actual work and standby duty in the scheduled workweek. The following is an example of how the percentage premium rate is applied:
Basic rate of compensation of the position_$3,200
Percentage premium rate of 20 percent_ 640
Aggregate annual rate- 3,840
The aggregate annual rate divided by 26 gives the aggregate by-weekly rate. In the above example, the biweekly rate is $147.69.
d. Aggregate rate. — The aggregate rate remains unaffected^ by irregular or occasional overtime, holiday work, night work, absence with pay, or assignments to other work for not more than 14 consecutive calendar days or that do not total more than 30 working days in any calendar year. The aggregate rate starts when the employee enters on duty in the position and ends when the employee ceases to be paid basic compensation in the position. If the employee is assigned to other duty for longer periods than 14 consecutive days, or the assignments total more than 30 working days in a calendar year, the aggregate rate ceases at the end of the 14 and 30 days, respectively and does not again start until the date the employee resumes his regular duties.
e. Premium rates. — Premium percentage rates are fixed by the Civil Service Commission for various types of duty,. as indicated below. The percentage rates will be applied to such part of the employee’s basic rate of compensation as does not exceed the minimum scheduled *336 rate of basic compensation of a GS-9. The hours of actual work stated in regard to the percentage rates are those customarily required by the position.
(1)Positions with tours of duty of 24 hours “on” and 24 hours “off,” such as firefighter positions:
(a) 60-hour workweek, actual work per week of—
24 hours or less_5 percent
25 hours or more_10 percent
(b) 72-hour workweek, actual work per week of—
29 hours or less_15 percent
30 hours or more_20 percent
(c) 84-hour workweek or longer-25 percent
*****
g. Saving clause. — Section 401 (b) of the Federal Employees Pay Act of 1945, as amended, further provides that “nothing contained in this section shall be construed to decrease the existing aggregate rate of compensation of any present employee, but when the position of such employee becomes vacant any subsequent appointee thereto shall received premium compensation provided for such position in accordance with this section.”
h. Existing aggregate rate. — The saving clause will be applied to firefighters and if necessary, to other graded employees subject to Section 401 of the Act. The saving clause will be applied on a pay period basis. As the “existing aggregate rate” is the rate paid before Public Law 763 amended the Federal Employees Pay Act of 1945, it is necessary that two computations of pay be made. One computation is made under the two-thirds rule, the other computation is made by using the percentage premium rate, and the highest amount computed is paid for the pay period involved. The following-rules will be applied, as shown in the examples given. These example are of firefighters with 72-hour workweeks, 30 or more hours of which are spent in actual work.
BULES
(1) Use basic rate of compensation in effect on last day of pay period in which is included the day of 31 October 1954.
(2) Use rates shown in General Accounting Office Salary Table No. 35 in computing overtime pay, night pay differential, and holiday premium pay (if a holiday is worked in the basic workweek).
(3) Apply two-thirds rule (NCPI 85.4-51) in computing pay for bi-weekly pay period, as if Public Law 763 had not been enacted.
*337 (4) Also compute pay for bi-weekly pay period, using current rate of basic compensation and current percentage rate of premium compensation. Divide per-. centage premium rate by: (a) 26 to determine bi-weekly rate.
(b) By 52 to determine weekly rate and— fci By 3744 to determine hourly rate.
(5) Compare computations under (3) and (4) and pay the highest amount.
EXAMPLE ONE
(1) Under rule (1), rate is CPC-6, $3,200 p. a., $1.54 p. h.
(2) GAO Tbl 35 rates: OT $2.11, NW, $0.15 HPP $1.54
(3) Basie pay, 80 Lours- $123.08
OT, 16 hrs_ 33.76
NW, 48 hrs_ 7.39
HPP, 8 hrs_ 12.32
Total_ 176.55
(4) Current basic rate, GS-4 $3,255 p. a., $1.56 p. h., current % premium rate, 20 % ($651.00)
Basic pay, 80 hrs_ 125.19
Percent prem. pay, (%g of $651.00)- 25.04
Total_ 150.23
(5) Pay $176.55.
i. Application of existing aggregate rates. — The existing aggregate rate, determined as provided above under the saved pay provision of Section 401 (b) of the Act, as amended, will continue unchanged by step increases until a rate of basic compensation is reached which, together with the percentage premium rate fixed for the position, exceeds the existing aggregate rate, or until the position is vacated. The existing aggregate rate remains unaffected by irregular or occasional overtime work, night work, holiday work, absence with pay, and assignments to other duty that do not exceed 14 consecutive calendar days or that do not total more than 30 working days in any calendar year. If the assignment to other duty exceeds 14 consecutive calendar days or totals more than 30 working days in any calendar year, the payment of the existing aggregate rate will cease at the end of the 14 and 30 days, respectively, and will not again start until the day the employee resumes the duties of his regular assignment. If the position is vacated, the existing aggregate rate will not be applied to the employee who fills the vacant position.
*338 l. Use of two-thirds rule. — The two-thirds rule may be applied to graded employees and ungraded employees whose daily tour of duty is 24 hours, in which is included periods of standby, actual work, and sleeping and eating time. Under this rule, two-thirds of each hour on duty is credited as pay time. The first 60 hours on duty, less one-third or 20 hours allowed for sleeping and eating, is regarded as the basic 40-hour workweek. The straight time payable during the basic workweek is two-thirds of the hourly rate of pay for each of the first 60 hours of duty. Night work pay is computed on the basis of two-thirds of the hourly rate for the hours of the workday during which the night differential is payable. For the “overtime” portion of the scheduled workweek, overtime is credited at two-thirds the hourly overtime rate. (Emergency and call-back overtime actually worked before the start or after the close of the scheduled workday, or outside the scheduled workweek, is credited at the rate of one hour’s overtime pay for each hour of creditable overtime work.) Holiday premium pay is credited at two-thirds the hourly premium rate for not more than 12 hours of the holiday. An employee to whom the two-thirds rule is applied is charged two-thirds of an hour’s pay, rather than an hour’s pay, for each hour in a nonpay status on a workday within his basic workweek.
m. 1'2-hour workday. — When the two-thirds rule is applied to daily tours of duty of 24 hours, the 24-hour workday should be scheduled as two separate and distinct 12-hour workdays. For example, a period from 0800 Monday to 0800 Tuesday should be scheduled as follows:
0800 to 2000-Monday workday.
2000 to 0800-Tuesday workday.
Scheduling the 24-hour period as two separate and distinct 12-hour workdays provides an 8-paid-hour workday and permits extension of holiday benefits on a more equitable basis than when the 24-hour period is scheduled as a single workday.
Some of the firefighters at Newport qualified for premium pay under this 1954 statute. To determine the percentage of such premium pay, under Civil Service Eegulations and the Navy regulations quoted above, it was necessary that there be in the records at the base a calculation as to the amount of actual work performed by the firefighters in a normal week. Such a calculation was prepared by an assist *339 ant chief of the fire department and two captains, all three individuals being plaintiffs in the present case, in conjunction with the chief of the fire department, who is not a plaintiff. This computation shows that on the average each firefighter worked 35 hours and 25 minutes per week. On each of his three tours of duty, it was estimated that he spent time on various activities, one-third of the 35 hours and 25 minutes prorated to the specific item as follows:

Hours Minutes

Roll call_ — 30
Housekeeping_ 2 —
Desk watches_ 2 —,
Apparatus and equipment maintenance_ 1 21%
Drills_ 1 30
Recharging and repairing fire extinguishers_ — 20
Station reports_ — 10
Fire alarm watches_ — 39%
Apparatus responses_ — 40
Fire prevention standbys_ 1 8%
Building inspections_ 1 3%
Hydrant inspection_ — 8%
Special and miscellaneous details_ — 16
Keference is made in the foregoing list of duties to “Fire alarm watches.” This is a specialized duty performed by a small group of firefighters assigned to the alarm center. During a period of time these firefighters worked 24-hour-on — 24-hour-off tours of duty, similar to the other firefighters. Starting in about 1954, however, the firefighters assigned to the alarm center were placed on a 40-hour week, composed of five 8:hour days.
20. Conditions of employment of firefighters at the Newport base were substantially unchanged from the effective date of the Federal Employees Pay Act of 1945, on July 1, 1945, to the date of filing the petition in this case. Defendant’s witness testified that if this claim had been asserted earlier and had it been determined to be meritorious, the Department of the Navy would have taken measures to abandon the two-platoon system of firefighters. It would have considered such alternatives as (1) a three-platoon, 40-hour week system, or (2) a substantial reduction of the number of civilian firefighters, supplementing their efforts with those of military or civilian personnel at the various installations.
*340 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, and judgment will be entered to that effect. The amount of recovery, as well as the amount of offsets, if any, will be determined pursuant to Buie 38 (c).

 Plaintiffs prepared their own food at facilities provided for them, or ate at military messes available on the base.

 See. 301, as amended by 60 Stat. 218, reads:
“Any officer or employee to whom this title applies who is assigned to a regularly scheduled tour of duty, any part of which, including overtime, falls between the hours of 6 o’clock postmeridian and 6 o’clock antemeridian, shall, for duty between such hours, excluding periods when he is in a leave status, be paid compensation at a rate 10 per centum in excess of his rate of basic compensation for duty between other hours.”

 “Four men were required to man the island fire stations during each tour. The boat trip required one-half hour each way. All plaintiffs are included in this claim, as all of them worked at each of the nine duty stations in rotation.

 61 Stat. 84.

 Bulot, et al. v. Freeport Sulphur Co. Inc., 45 F. Supp. 380.