Nichols, Judge,
dissenting in part:
I have no quarrel with the court’s decision to adopt the trial commissioner’s opinion and findings -per curiam, except for the portions of both which deny plaintiffs overtime compensation under Count I for time, in the inclement parts of the year, spent on defendant’s vessels afloat on Plum Gut, returning to Orient Point from their work on Plum Island.
The issue turns on whether such travel is “arduous” under the statute quoted by the commissioner. I do not think either he or the parties have sufficiently clarified their thinking as to what this means. There are cited no legislative history and few court decisions. Webster’s Unabridged gives alternatives. The one that best fits is “hard to endure” and that I adopt. No definition indicates that “hazardous” is a synonym, and I conclude that travel may be arduous although the element of physical danger is absent or minimal. On the other hand, travel by common carrier or in one’s private automobile, is often tedious and irksome, but not to the extent we do not become inured to it. Thus I see “arduous” travel as something not necessarily dangerous but more difficult to take than ordinary travel.
In Ahearn v. United States, 142 Ct. Cl. 309 (1958), we held that time of travel aboard defendant’s motorboats in the peaceful harbor of Newport, Rhode Island, was not com-pensable. We said it involved no risk but I do not think that was the determinative factor. Evidently, if Congress required risk, the statute would have little room to operate and the purpose of enacting it would be hard to find. It is not to *362 be supposed that the Government knowingly exposes its civilian employees to avoidable risks.
It 'seems apparent to me, whether or not the commissioner applied the 'above as his standard of what was compensable travel time as a matter of law, he went seriously astray in his Findings of Fact. I make this statement with full respect for the burdens thrown on one who makes it by Rule 66 of this court. I think he gravely mistook the basic facts as to the hydrography, geography and meterology of the area, as established by evidence before him and matter subject to his judicial notice. I do not possess any extrajudicial knowledge and therefore do not call on it; I once sailed through Plum Gut but saw nothing then contrary to what the commissioner has found. As to notice of the judge’s personal experiences, however, cf. Union Pacific R.R. v. United States, 117 Ct. Cl. 534, 549 (1950).
Plum Island is the southernmost of the series of stepping stone islands and reefs, extending from Orient Point at the East end of Long Island northeasterly to the Connecticut shore. Plum Gut is the southernmost of the constricted water passages between them that constitute the Eastern water exits from Long Island Sound. Hell Gate, solo, is the Western exit. Per the 1960 Coast Pilot, Cape Cod to Sandy Hook, plaintiffs’ exhibit 29, the tide rises and falls a mean of 7.3 feet in Western Long Island Sound.
(NOTE: There is a 1966 Edition of this work, which as an official Government publication would be subject to judicial notice. Presumably the 1960 Edition was offered as closer to the claim period involved. Unless otherwise indicated, facts attributed to the Coast Pilot as authority appear in both Editions).
This rise and fall of 7.3 feet may be contrasted to a mere 1.5 feet in the part of Chesapeake Bay nearest to Washington. It means that an enormous volume of water must enter and leave Long Island Sound approximately twice every 25 hours. The portion of this water that enters and leaves via Hell Gate creates the conditions that gave the place its name, but Hell Gate is not comparable to the Eastern exits, because it discharges into and draws from waters which are them *363 selves landlocked, and therefore the turbulence is not greatly magnified by wind and wave effects. While testimony for defendant frequently mentioned the alleged comparability of Hell Gate, the most casual glance at the Government charts would show this essential difference. Per the Coast Pilot, the situation as to Hell Gate is that the heavy traffic, the crooked channel, and the strong tidal currents require extra caution to avoid accident or collision.
The currents at Plum Gut are of somewhat less velocity than at Hell Gate, the traffic is nothing like as great, and the channel is not crooked. The caution the Coast Pilot says is required there is for entirely different hazards.
Fog may be mentioned in passing. This is one of the foggiest areas on the United States Atlantic Coast. The tables in the I960 Coast Pilot show a mean of 53 days per year of heavy fog at Block Island, the nearest recording point, about 20 miles East of Plum Island. In the 1966 Edition this shows as 82 days. There is a fog signal on Plum Island itself. In both Editions it is shown as averaging 429 hours of operation per year. There is no fog like this at Hell Gate. However, as making the Plum Gut crossings “Hard to endure” I see it as secondary to other matters which will appear. Fog would primarily be a problem for the crews, and as to passengers, it would be mainly a morale factor. Groping about blindly in heavy fog is something few passengers enjoy, but defendant’s vessels had radar.
The presence of floating ice is common, per the Coast Pilot, in winter in Eastern Long Island Sound, the Pace, and Block Island Sound, and while Plum Gut is not expressly mentioned, it would seem there must be ice there too, as it is a part of those waters.
The defendant’s expert, Coast Guard Lieutenant Commander Moore testified, and the commissioner found, that Plum Gut is generally calm because sheltered from the. open sea, except in two specific directions. The Commander qualified his testimony in an important respect, however, which the commissioner failed to note. He said that when the winds blew parallel to the axis of the Gut, the adjacent land areas afforded no shelter whatever, and heavy swells passed right *364 through. Defendant’s exhibit 1 a, C. & G. S. Chart 362, shows that the axis runs approximately northwest to southeast. Now, turning back to the Coast Pilot, we read that from October to March the prevailing winds are between west and north. They are variable in Spring, and only from June to September settle in the west and south, from which direction the land mass of Long Island would afford shelter. It also appears that the wind force from December to March averages between 4 and 5, 11-21 knots. Gales (force 8 or higher, 34-40 knots) are encountered in 8% of winter observations and are “most likely to arrive with westerly or northwesterly winds.” I conclude, though the authority does not say so expressly, that north and west winds of force 7 (28-33 knots) and 6 (22-27) must each be at least as frequent as force 8 winds, or more so. Per the 1966 Coast Pilot again, large waves begin to form with force 6, and the “Sea heaps up” with force 7.
Thus the alleged sheltered position of Plum Gut is proven to be mythical with respect to the contingency where shelter would be most valuable, the occurrence of a strong wind or winter, gale, force 6 or upward. Commander Moore also conceded that the configuration of Long Island Sound is such as to give waves formed by west and northwest winds a long run and ample chance to build up, before reaching Plum Island and Gut. Captain Pearson stated they come from about New Haven.
Easterly winds are evidently less frequent, but gales from that direction do occur and may be protracted, and the Gut is even more exposed to them. They can come in from the open Atlantic through the fifteen-mile opening between Montauk and Block Island, and deliver, according to testimony, awesome seas that break clear across the bulkhead at Orient Point.
The commissioner, having excluded the wind as a factor, is equally quick with the tide. He refers in his Finding 39 to the tidal rip which he says causes considerable water turbulence, which could almost always be avoided. This is apparently 'based on testimony that the rip was located in a limited area between the two lighthouses which are on Orient *365 Point and Plum Island respectively. A course could be laid from the Government pier on the southeast side of Orient Point, passing southeast of the rip so delimited, to Plum Island Harbor, which was about 14 mile southeast of the lighthouse. Other testimony assigned the rip a much larger area, lying along the entire southwest shore of Plum Island so that no one could enter the harbor without crossing it. Captain Pearson, whose qualifications are stated infmy so testified. If this were a simple contest of credibility, perhaps the commissioner could choose whom to believe. It seems unlikely, however, that anyone would lie about a matter the commissioner could easily establish by simply visiting the Gut. I interpret the testimony as meaning that the more restricted area was the worst but that a broader area was often troublesome. The 1960 Coast Pilot says that the average current velocities in the Gut — presumably between the lighthouses, where the passage of water is most constricted — are 3.5 on the flood, 3.9 on the ebb. Curiously the 1966 Coast Pilot makes it 4.3 on the ebb. A mariner would understand this to mean that elsewhere in the area the water would be in motion too, at lesser but still substantial rates. A tidal current of as little as one knot, against a moderate wind, has a noticeable effect in making waves higher and steeper, and this effect in no way depends on submerged rocks and reefs such as complicate things in Plum Gut. The evil effect of tide running against wind multiplies as either wind or tide increase in velocity, and is mentioned by the Coast Pilots in warning of conditions at several points along our shores. Thus in case, e.y., of a northwest gale sweeping through the Gut against a flood tide, all the waters thereabouts would be unpleasantly turbulent and the rip proper, as envisaged by the defendant’s witnesses, would simply be the worst. This explains why plaintiffs’ witnesses described the rip as a larger area. The tide velocities at Plum Gut are exceeded at but a few points, and those generally less exposed to waves.
I may add, I do not think Commander Moore was in a position to furnish substantial evidence in opposition to the testimony about turbulence in the Gut. Plis acquaintance with it derived from a 3 year tour of duty in command of a 160 *366 foot Patrol Boat based at New London. His visits to Plum Gut occurred about four times a month and were made in the course of checking and maintaining the navigational aids. He conceded he would normally select good-weather intervals to perform this function, but recalled one occasion when he had to replace the Midway Shoal Buoy, which had gone off station, in a 35-40 mile gale. Nevertheless, his sampling of Plum Gut conditions clearly was weighted in favor of benign weather periods. He rejected the Coast Pilot description of the tide rips in the Gut as “heavy”, and stated he would not think it necessary to warn mariners, as the Coast Pilot does, to exercise caution when using the passage, further evidence that his experience of the Gut was atypical. The same may be said of the defense witnesses who were managerial personnel on Plum Island, and who used the Government ferries to Orient Point frequently, no doubt, but at their convenience and not on a fixed schedule, winter and summer, day and night, foul and fair, as plaintiff shift employees did.
Plaintiff’s witness Captain Pearson was impressive, to the point that to my mind testimony contrary to his, if perhaps some evidence, may be deemed not substantial. He was disinterested, not claiming under Count I. He had been licensed to operate small passenger vessels since 1924 and his experience since then was extensive. Instead of sampling Plum Gut on occasions weighted in favor of good weather, he actually navigated it during the claim period on 'a fixed schedule, to repeat, day and night, foul and fair, winter and summer. He illustrated his testimony with photographs. He considered the area the most hazardous he had ever navigated. He described laying to off Plum Island Harbor in the 64 foot boat and being unable to get in, which would indicate the harbor entrance could not be outside the area of great turbulence. He mentions the converted LSM type as being also outside and unable to get in there because of the seas.
The Agriculture fleet included one of these vessels, and it was their largest, but inability to enter that harbor necessitated smaller boats being used in bad weather. The LSM has a flat bottom which produces a crabwise movement in a beam wind and sea, and the harbor entrance was but 80 feet wide. *367 The worst navigation being found at this point has a bearing, I think, on the impression our commissioner seems to have formed that a course could be laid to and from that harbor which avoided turbulent areas.
The commissioner has found that the boat captains could cancel trips when they believed it dangerous, but they did so only on a few occasions. Obviously, frequent or protracted interruptions in the service would make impossible the Department’s scheme of employing shift personnel living off the island to keep the laboratory operational on a 24-hour basis. One defense witness stated that during a three year period when he lived on Plum Island and used the service to take his children to school, it was interrupted only once, and that because of a hurricane.
There was no halt because small craft warnings were displayed. These, according to the Coast Pilot, warn of:
“winds dangerous to navigation”
and specifically:
“winds up to 33 knots and/or sea conditions dangerous to small craft operations”
Captain Pearson testified that some of the smaller boats employed in the ferry service could take weather in excess of such conditions, and those apparently were the ones operated when such weather prevailed. Thus, when it was too bad for the LSM, instead of the ferry being stopped, smaller but more seaworthy boats were used instead. Notice of winds over 34 knots was given by “Gale warnings” and there was no testimony what effect the display of that warning had on ferry operations.
I would revise Finding 38 either by deleting the last sentence which says that a Coast Guard Lieutenant Commander testified that he did not think Plum Gut demanded more than routine caution, or else by adding that this witness (a) thus contradicted testimony of experienced mariners who had navigated Plum Gut much oftener than he had, and (b) took issue with the mariner’s bible, the Coast Pilot, in its statements that tidal currents set through the passage with great velocity, that heavy tide rips occur, and that caution was recommended when using this passage. He flatly said, I would *368 continue, that he did not agree with the first two statements, and as to the third, it was a function of size. He did not explain whether it was large size or small size which would exonerate the mariner from exercising caution.
I would revise Finding 39, to read as follows:
39. Plum Gut, being sheltered from the open sea except in two general directions, is generally calm in summer when the prevailing winds do not blow from those directions. In winter, when they do, and frequently with gale force, the Gut cannot be considered sheltered. It has heavy tide rips and mean tidal currents are stated in the Coast Pilot, a United States Government publication, to be 3.5 knots on the flood and 4.3 on the ebb. The conjunction of such conditions, when it occurs as it frequently does, produces wave effects of great turbulence. In maintenance of the ferry service, such turbulence can frequently not be avoided.
I would not make any finding about the discretion of boat operators to cancel trips as I think such cancellations were too infrequent to have a substantial bearing on whether the travel was “arduous”, even though, as assuring it would not be “hazardous”, it had its importance to all those concerned.
A proper Finding 39 having been made as to the hydro-graphic, geographic, and meterological conditions in different seasons at Plum Gut, the next step would be to apply it in determining whether the travel across it was “arduous.” The boats were well manned and maintained, with radar. They were inspected by the Coast Guard and rated as to how many passengers it was allowable for them to carry, which allowances were not exceeded. Therefore, they were not overcrowded. Passengers were seated on benches, in cabins sheltered from wind and rain. They might, if it was raining, get wet boarding or disembarking, but so they might using a common carrier.
The case pretty much simmers down to the motion of the boats when confronting turbulent seas. The testimony indicates that it was such that passengers got seasick to the point of nausea and vomiting. This on a passage normally 20 minutes and never exceeding 40, would take some doing. People often get seasick while afloat, but rarely within 20 minutes *369 of leaving tlie pier. A proper Finding 39 would indicate why. It would show the frequent encountering of wave formations differing in hind from those met on the open ocean, waves that would inflict on a small vessel a terrible tossing around, jerky and arhythmic, not the slow regular pitch and roll caused by ordinary waves. Witness Nose testified it was impossible at night to tell from what direction the seas would hit the boat.
Defense witness Dors testified he couldn’t help it if people were landlubbers. The seasick ones, however, may not have been landlubbers. It is said that Admiral Lord Nelson got seasick at the start of every one of his great campaigns. A better answer is that our pay laws are made for ordinary people. There are many more landlubbers in this country than there are of those who would rejoice in a nocturnal bouncing around in a winter gale on Plum Gut. The resistance to this claim seems to stem from a callous attitude towards seasickness, which many people, not seasick themselves, regard as a j'oke like a case of sunburn. Mr. Dors said he loved the sea, but it did not appear that 'any of the pleasure boats whose summer presence on the Gut figured prominently in the testimony, were likely to be found there during winter gales. Navigation then is strictly limited to those whose occupation requires it.
Plaintiffs already had the trip out included in their com-pensable time, and it does not seem unreasonable to me that in winter at least they should want to be paid also for the return.
Much is made of the use of these boats by children and women. Defense witness Faszczewski testified he lived on Plum Island for three years and sent his four children across on the ferry every school day, so they could attend school at Orient Point or Greenport. They missed only one day due to a hurricane. He did not think the trip dangerous or hard on the children. There were other families on the island doing the same. All the evidence, however, supports his view that it was not dangerous. As to not being hard on the children, the children did not testify. If they did, they might tell us that it was worthwhile making an arduous trip to get an education. But we all see children doing many things at play *370 that adults would deem it arduous to have to do; e.g., climbing trees. If, as to which there is no evidence, the trips were not arduous in the children’s eyes, that has to me no connection with whether they were arduous for adults. Curiously, Mr. Faszczewski was just about the only management witness who did not testify that he considered the passages were non-arduous for adult employees. As to the women, I do not think the evidence is specific enough as to the regularity of and reasons for their use of the ferries to justify any inferences. None of the employees, plaintiffs in this suit, who used the ferries day and night, foul and fair, winter and summer, were women.
Of course, even in winter there would have been many pleasant rides. However, the other kind were not acts of God, sporadic, or unusual. They were, over any extended period, statistically, predictable because due to wind and current conditions that were normal and usual. On any agreeable day, the expectation of the other kind would always be present. The Coast Pilot mentions rapid weather changes as a feature of winter months. One who really wanted to make a Federal project out of this claim might establish some standard, as e.gn that the waves were four feet high or more, and try to determine what proportion of trips out of all that were made, encountered such waves, and adjust the award accordingly. I think this would be absurd and not at all what Congress intended. If sitting in the boat some of the time is work, it is so all the time, at least in the same season of the year.
I am inclined to agree with the commissioner and court, however, that plaintiff failed to make out its claims as to the summer months. There is nothing in the record to show that arduous conditions then were more than sporadic, and if plaintiffs got paid even for the pleasant rides in winter, the reverse would be fair for summer. The commissioner’s mistake was in projecting summer conditions all through the year. I would limit recovery on this part of Count I to the months October to March at most, as these are the months of prevailing west and north winds. A more conservative approach might limit it to December-March, or even to calendar *371 winter. In a dissent, I need not reach this issue, which does not arise for the majority.
I regret that this part of the claim has not received consideration such as would attach some purpose and meaning to the Congressional enactment calling for overtime pay in case of travel under arduous conditions. It seems to be intended as an important addition to the rights of Federal employees. Even though the amount here claimed is apparently small, and that due, in my opinion smaller yet, and even though the proof of the claim is not all it might have been, the case might have furnished a laboratory example of how this statute should be interpreted and applied.
FINDINGS on Fact
1. This is an action for overtime pay by 43 wage board employees of the Agricultural Eesearch Service of the Department of Agriculture. They were employed at the Plum Island Animal Disease Laboratory (hereinafter sometimes referred to as PIADL) which is located approximately 1 mile off the eastern tip of the north fork of Long Island, New York. The 35 plaintiffs listed in Count I of the petition were operating engineers and electricians at PIADL. They make claim for overtime pay for %-hour lunch periods between May 31,1959 and March 12,1960, and for the 20 minutes at the end of each work day they spent traveling from Plum Island back to Orient Point, Long Island, from December 8,1958, to date of judgment. The eight plaintiffs listed in Count II of the petition were members of the boat crews employed by the Department of Agriculture on boats which made regular trips between Orient Point and Plum Island. They make claim for pay for their lunch periods between December 8, 1958, and December 22, 1959.
Each plaintiff generally worked 40 hours of straight time per week during the respective claim periods, irrespective of the lunch periods and travel time in dispute. The trial of this case was limited to the issues of law and fact relating to the right of plaintiffs to recover, reserving the determination of amounts of recovery, if any, for further proceedings.
*372 2. The Plum Island Animal Disease Laboratory occupies most of Plum Island. This island is about nine-tenths of a mile wide and two and a half miles long, and is unconnected to any other land by bridge or tunnel. PIADL is and was engaged in the study of foot-and-mouth and other exotic animal diseases. The facilities on the island included two laboratories, a steam and powerplant, a sewage decontamination plant, administration buildings, animal holding areas, and other structures. The Department of Agriculture had taken over the installation in 1954, and started operating the first laboratory in 1955. About 340 men and women worked at the installation in the material periods. Of these, 260 were day workers, including the scientific staff, secretaries, clerks, engineering and plant maintenance personnel, guards, firemen, and others. These employees all traveled to the island either by a boat owned by the Department of Agriculture or one of three LST’s which were owned and operated by the New London Freight Lines, Inc.
3. Maintenance and operations work at PIADL was done by shift workers and day workers. There were three 8%-hour shifts in each day as follows:
Shift 1: 12 midnight to 8:45 a.m.
Shift 2: 8:00 a.m. to 4:45 p.m.
Shift 3: 4:00 p.m. to 12:45 a.m.
The overlap was to enable the plants to be run continuously. The shift workers were rotated among the shifts, so that each shift worker experienced every shift over a 3-week cycle. Day workers were on an 8:00 a.m. to 4:30 p.m. workday. All of the plaintiffs under Count I are shift workers.
4. On October 16, 1958, maintenance and operations personnel were given the following directive from H. J. Eeed, the maintenance operations foreman for buildings 101 and 103:
This memo is intended as a reminder to all peoples concerned that mechanical maintenance and repair in this plant is a round-the-clock, 24 hr. a day operation.
The writer expects therefore that any mechanical failure that is noted during a tour of duty will be rectified. The only justification for not attempting to *373 carry out this procedure is lack of time. By that it is meant any failure occurring in the last thirty or forty minutes of the tour. It is to be expected that a job may be too large to be completed in one tour but an attempt must be made.
You should also be reminded that any such malfunctions or failures should be properly noted in the operating log of this plant.
It is expected that henceforth it will not be necessary to arrive at the plant at the beginning of the day shift and be told that any piece of equipment failed, ‘last night’ and not find that some repairs had been initiated. [Emphasis as in original]
This directive remained in effect throughout the claim period, i.e., through March 12,1960.
5. At the time of the above notice, and until May 31,1959, the shift workers were paid for the entire 8%-hour shift, 8 hours at straight time rates and % of an hour at overtime rates.
6. Then the shift workers were notified that, effective May 31,1959, a half hour of their shift would be considered a lunch period, and consequently they would be paid for only 14-hour overtime per shift. No specific half-hour period was designated; the men were told to work out a system whereby they would relieve each other of any tasks that could not be postponed for half an hour.
The following is typical of these notices:
Effective Midnight, May 31, 1959 (This is Sunday morning) all watch standers shall be charged % hr, for lunch. Therefore instead of getting % hr. O.T. daily, you will receive only 14 O.T. daily.
It shall be up to the operating engineer in charge, to see that half of his crew eats their lunch in one period and the other half the next period; at no time, will the lab. be unmanned.
All Watch Standers Sign Below: (This includes day personnel who stand watches.)
A prime motive 'for this step was to reduce operating costs at PLADL.
7. During the claim period, Agricultural Research Service regulations required that any regularly scheduled overtime *374 be approved by the Service’s Personnel Division in Washington, D.C. Authority to approve unscheduled (i.e., irregular) overtime of an emergency nature rested with the PIADL director. The scheduling of the half-hour lunch periods and the deletion of a corresponding amount of regularly scheduled overtime was approved by the Service’s Personnel Division.
8. The shift employees signed the notices as directed, but advised management through their representatives of their dissatisfaction with the cut in overtime pay.
9. On June 30,1959, the shift workers wrote to the Personnel Division of the Agricultural Research Service, Beltsville, Maryland, describing their situation and inquiring about the general policies with respect to payment or nonpayment for lunch periods at other Department installations (especially with reference to continuous 24-hour operation of equipment) . They also asked for a list of such similar installations.
10. They received a reply dated July 23, 1959, in which they were informed that there apparently were no similar installations. No explanation of Agricultural Research Service pay policy was given.
11. On September 10, 1959, notices were posted on the bulletin board in each building, prescribing 90-minute periods, in the middle of each shift, within which the %-hour lunch periods were to be taken. Plaintiffs continued to protest the ^-hour cut in overtime pay.
12. The union representatives of the plaintiffs met with management personnel in January 1960, and again on March 7, 1960, to protest the %-hour deduction.
13. On March 9, 1960, a memorandum from the maintenance and operations foreman at Building 103 was issued to the watch supervisors, providing:
Subj. Crew Training
Effective immediately it will be the responsibility of the supervisor in charge of each watch (OE4) to see that AEL Personnel in his respective crew in Bldg. 103 are adequately trained to perform the necessary operations in supplying electrical and steam power to Plum Island *375 facilities. A thorough familiarity with both boiler room and generator room by all crew members is necessary. Each man shall be expected to carry out emergency operations necessary for both areas in the event of electrical or mechanical failure.
The watch supervisor shall notify the Foreman in charge immediately upon compliance with this directive.
It is expected that a maximum of two (2) scheduled work weeks should be sufficient for completing this training period.
14. On March 10, 1960, notices were posted setting out specific %-hour lunch periods for every worker in every shift in the four pertinent buildings, effective March 12, 1960. This satisfied the maintenance and operations workers and marks the end of their claim period for overtime pay for the %-hour lunch periods.
Each notice stated inter alia the following:
All personnel are relieved of responsibility during their respective lunch periods. However, if prior to an individuals lunch period he is ordered to work through his scheduled lunch period he will then be paid overtime for his cancelled lunch period.
15. On October 3, 1960, the plaintiffs among others filed claims with the General Accounting Office for the %-hour deductions made in the period between May 31, 1959, and March 12, 1960. These claims were disallowed. Thereafter the plaintiffs, by their representatives, in at least seven letters dated between June 24,1961 and July 26,1963, attempted to get the decision reversed. The General Accounting Office, however, consistently denied the claim.
16. Upon arriving at Plum Island, each employee had to show Ms pass and be identified by armed, uniformed guards at the main guardhouse, who then allowed the employee to proceed to the bus or other conveyance which would take him to his duty station. Those who worked in the laboratories (buildings 101 and 257) or the decontamination building (102) again had to identify themselves at their respective buildings.
*376 BUILDING 101
17. Building 101 is and was a laboratory. A partial list of its equipment included the following:
Steam Operating Equipment: Nine steam reducing stations, 16 large autoclaves, 9 sterilizers, 12 distilled water plants, 18 liot water heaters, 2 laundry washing machines, 2 tumble dryers, 3 clothes presses, dozens of wash-down stations, and 4 condensate pumps.
Air Conditioning Equipment: Forty-eight air exhaust units, 50 air supply units, 25 air compressors, 30 air reducing stations, two 250-ton Carrier units, one 300-ton Carrier unit, three 800-gallon-per minute chilled water pumps, and 35 low pressure control boards. .
Two incinerators with a capacity of 2,000 pounds of,-meat per hour. An incinerator burn was usually held twice a week.
Laboratory Equipment: Centrifuges, freeze dryers, low temperature ( — 40° to —120° F.) freezers, incubators, walk-in cold boxes, electric ovens, glassware washing machines, bacteria hoods, etc.
18. The maintenance and operations employees in building 101, as in all the buildings, were divided into two categories: shift workers and day workers. The day workers, of which there were three, were subject to reassignment to shift work at any time. In the claim period, shift crews in 101 were comprised of either four or five men.
19. The maintenance and operations personnel, including the shift employees, were responsible for the installation, inspection, maintenance and repair of the equipment in the building. If any faulty equipment was located during a tour of inspection, the watch on duty was required to repair it to the extent that available time and materials would permit, and not leave it solely for the day workers.
There were two thorough checks of the plant in each shift, one at the beginning, and one towards the end. Each of these occupied three men and took about an hour and a half to complete. However, it was not essential that these checks be performed at any particular time. There was a comprehensive alarm system which informed the men when equipment mal *377 functioned. All of the shift workers were trained to watch all the equipment for emergencies.
20. All the men usually ate together. Testimony on the length of the eating period varied from 15 to 20 minutes to half an hour. Sometimes, if a problem arose, they would all stop eating and attend to it, although it often happened that only one man was needed. Such interruptions were random and infrequent. Following each of the dates of May 31, 1959, and March 12, 1960, the men would eat in shifts for a short time, but soon drifted back to eating together.
BUILDING 102
21. Building 102 is and was the sewage decontamination plant. Its function was to render sterile all sewage and liquid wastes from building 101, before these materials were allowed to flow into Long Island Sound. The potentially most infectious materials found on Plum Island flow into this plant at a rate averaging approximately 1 million gallons per month.
The building itself is a windowless structure of concrete, cement block, and steel. It is two stories high and has a basement and a sub-basement. Entrance is restricted to authorized personnel, and entering and departing employees must take showers.
During the claim period four shifts of two men each plus an operating engineer leader (who worked days only) staffed this building for an around-the-clock operation.
22. The duties of the employees, in addition to decontaminating the sewage from building 101, were to perform routine maintenance, cleaning, and repair operations.
The decontamination was carried out either by a processing method or by a batch-cooking method. Seldom were both of these methods employed at the same time. When the plant was batch cooking, someone would go in every 15 minutes to check. Decontamination was carried on about 90 percent of the time. Other times the plant was idle, i.e., sewage was just coming in and being deposited in the tanks, *378 Both employees on each shift were trained to operate the decontamination processes.
Cleaning, inspecting and repairing were more or less continuous, with the building kept in a very clean condition. The operator often assisted his helper. Sewage on occasion could be low for the entire day, especially on weekends. The batch-cooking facilities were cleaned about every 2 weeks,; this required about 2 hours for each tank. Because of the heat, the two shift workers generally alternated for 15-minute periods. The man not doing the cleaning would check once in a while to see if the other was all right.
23. The men ate in the room in building 101 which contained the controls and the warning (annunciator) panel. The main panel apparently did not indicate the tank level; the tank level indicators apparently were in another room. In any event, when a tank was nearly full it was better practice to watch it directly.
But while the tanks had to be checked to make sure they did not overflow, the sewage flow into them could be transferred to an empty tank before lunch. Moreover, the processing system could have been secured or put on recirculating before lunch, but it is not certain that it was made clear to the employees that this was allowable.
24. Before and during the claim period, the men usually ate together. They took about half an hour to eat. There was no change in eating habits even at the beginning of the claim period. The plant was in operation during these eating periods. If something went wrong while they were eating, one man would take care of it.
After March 12, 1960, the end of the claim period, lunch habits changed for a short duration, but then the employees went back to eating all together.
25. At the time of the trial, only one-man shifts were used in the building 102, although substantially the same work was performed.
BUILDING 103
26. Building 103 is and was the steam and emergency powerplant. It furnishes steam for both work and heating *379 purposes to buildings 101 and 102, and to the guardhouses at 101 and the block area. It is of concrete, cement block and steel construction. A large main section houses the 50,000 lb./hr- boilers, fuel and feed-water pumps, water softening-equipment, air compressors, and the other auxiliaries common to a plant haying steam boilers. A smaller wing contains the office, supply and change rooms, and the generator room, which housed the 1,650 hp. diesel electric generating unit.
During the claim period four shifts of three men each plus a varying few day men operated this building and its plant on an around-the-clock basis.
27. Except for the diesel, the plant is continuously operating. At least one of the two boilers is always running, and at least one of the pumps. Moreover, continuing surveillance is necessary, and the supervisor considered two men to be the minimum needed. There was no alarm on the steam pressure, but there were automatic valves to release excessive pressure. However, none of the work had to be done at any particular time. Normal checks and log readings were taken on the hour, but the time could vary 10 to 15 minutes in either direction. The checks would not interfere with a %- hour lunch period. All the workers had training to do all the work, except for running the diesel engine. Only the electrician was competent to do this. However, the diesel, being an emergency unit, was rarely used. It was given a weekly preventive maintenance run, and was run 13 other times during the claim period. Six of these times, the power generating equipment was actually put on the line to Plum Island. For 264 hours beginning on August 4, 1959, the generator operated continuously, and during this emergency the diesel crews were supplemented so there would be two men in the generating room at all times. Except for the power failures when he had to run the diesel, the electrician in each shift used his discretion as to which repair or maintenance job he would perform at a given time. In short, none of the routine work to which he was assigned had to be performed without delay.
*380 28. While the men in. building 103 did have to work in outlying parts of the island, most of these jobs were short routine trips, and most of them required only one man. An examination of the activity during 514 months of the 914-month claim period, as recorded in the building’s log books, reveals that during this 3,936-hour period, two or more workers were away from the building at the same time for a total of only 68 hours, or a little less than 1% percent of the time. All but 1 hour and 50 minutes of this was during the day shift.
29. Not only was the plant in building 103 seldom without the full complement of workers assigned, but it would appear that even when absences occurred, workers remaining were not greatly pressed by lesser manpower.
On the following days, absence from 103 was at or near its highest during the claim period:
On June 15,1959, two workers spent 1% hours together at a pumphouse in the morning, and another 2 hours there in the afternoon. Another worker was at building 101 for 2% hours in the afternoon, some of this coinciding with the other workers’ time at the pumphouse. The log report on those who remained at 103 reads: “Eoslak and Isaacs overhauling well pump #1. Littlefield removing old packing from No. 1 fuel oil pump. Eepacked pump with matallac packing. Gebhart on plant watch. No. 1 softener regenerated, took brine in normal operation. Normal operation entire shift.”
On October 6, 1959, when the two day workers and the supervisor were away for 3 hours, leaving only the three shift workers to run 103 for that period, the log shows that one of them cleaned the generator room and built a wind stop for the north generator room door. Pens on the Hagan (pneumatic control system) board were cleaned and made to operate, and the latch on the left Plagan board door was also made to operate. The supervisor’s office was cleaned and tallow was removed from the floor at several places. Normal operation was reported for the entire shift.
On December 9, 1959, when two of the day workers were in 102 for 2 hours and 40 minutes, the shift employees in 103 worked on remodeling light fixtures, did some electrical *381 maintenance, and cleaned the generator and workrooms. They also swept floors, worked on chlorine valves, and straightened up. This was recorded asa routine shift.
Finally, plaintiff Carr, who was president of plaintiffs’ union lodge, admitted that their duties did not require the men to be working continuously.
30. In building 103, as well as in the other buildings involved, duties remained the same before, during, and after the claim period. Before and during the claim period, all the workers generally ate together. After the claim period, they all ate together except plaintiff Davids, who ate where he could see the controls, although he received no orders in this respect. Davids was then secretary of plaintiffs’ union lodge. The testimony differs as to how long these lunch periods were. The supervisor testified that they were about half an hour; the plaintiffs testified that they lasted between 15 and 20 minutes.
BUILDING 257
31. Building 257 contains a laboratory, steam heating boilers, an incinerator and a sewage decontamination plant. This building became operational for Department of Agriculture purposes in May of 1955. At that time, the machinery area was not linked to the decontamination area. Subsequently, and prior to the claim period, the separate building areas were joined by the enclosure of the space between them. This eliminated the necessity for the workers to take decontamination showers to move back and forth between the decontamination and machinery areas.
32. In the claim period, the building was manned by day workers and shift workers. A shift crew was composed of two or three men.
33. The boilers were located in the same area where the men ate their lunch. The incinerator was usually run only on Friday. It was customary to start it early in the morning. The animal handlers would charge it, and the shift employees would start it by pushbutton, and control the oil flow by hand, bringing it up to the required temperature. It had a temperature warning control and it was not necessary to attend it closely at all times.
*382 The decontamination system was not in continuous use. Sewage was processed just during tbe day and many days it was not processed at all. There appears to have been little danger of a sewage tank running over since the system could be switched to an empty tank if no one was going to be in attendance, and in fact the tank seems seldom to have run over, if at all. After the sewage was processed the tanks would be cleaned. Because of the heat, it was impossible for one worker to clean them for more than 20 minutes without rest.
Shift workers did not make lab checks during the day, but did make them during the night. These took from 1 to 1% hours. The time of the check was left to the discretion of the worker.
Processing was done during the day, and batch cooking, which takes up less of the workers’ time, was done at night. None of the work had to be done at a particular time.
The pace of the work was slow enough that the entire plant could be shut down for lunch period. This is apparently the procedure used after the claim period. The primary reason that it was not used during the claim period is that the plaintiffs did not think it was allowed.
34. The shift workers often arranged it so that one of them would keep an eye on the equipment while the other was busy, e.g., doing repairs. The two shift workers ate together most of the time, although not always at the same time, from day to day. During the day, all the men except one would eat together.
35. The men in 101, 102, and 257 always ate inside the buildings because they would have had to take decontamination showers whenever they left them, although not on their own time. The men in 103 often ate outside in the summer. There was a cafeteria on the island, but even the men in 103 (who didn’t have to shower out of the building) could not reasonably go there to eat because it was too far away. However, during the day, when the cafeteria was open, the men occasionally ordered meals brought over from it. The lunch facilities in the buildings generally consisted of no more *383 than a table, a hotplate, and a refrigerator in one of the workrooms.
PLTnsi ISLAND TO ORIENT POINT
36. The plaintiff shift employees also seek overtime compensation for the 20-minute boat ride from Plum Island to Orient Point at the end of each shift, across the stretch of water known as Plum Gut. They made this return trip on a Coast Guard inspected vessel owned by the government.
37. Like all other employees on Plum Island, they were on pay status in traveling to Plum Island, but not in returning.
38. No work was performed during these return trips. The vessels were not overcrowded and everyone usually had a seat. Women often rode to Plum Island on the same boats, wearing clothes they would normally wear to an office or a laboratory. In the past, school children made daily crossings from Plum Island to Long Island and return on comparable vessels. Their parents did not consider the trips dangerous or in any way hard on the children. A Coast Guard Lieutenant Commander testified that he did not think Plum Gut demanded more than routine caution.
39. Plum Gut, being sheltered from the open sea except in two specific directions, is generally calm. It has a tidal rip which causes considerable water turbulence, but this can almost always be avoided. The weather and seasons made the trips hazardous sometimes, but such circumstances were relatively infrequent. Moreover, the boat operators in their discretion could cancel trips when they believed them to be dangerous, and they did so on a few occasions.
40. Plaintiffs did not make any claim to the General Accounting Office for this 20-minute travel time.
41. The parties have agreed that plaintiffs in Count I are wage board employees, and as such, are not subject to the Classification Act of 1949, as amended, (5 U.S.C. 902(c), 1958 Ed.) and accordingly are not within the purview of section 201 of the Federal Employees Pay Act of 1945 (5 U.S.C. 911, 1958 Ed.).
*384 42. Administrative Memorandum 402.2, promulgated September 30, 1963, by the Agricultural Research Service, Department of Agriculture, contained provisions for premium pay for wage board employees, and in part H of Title VIII thereof, stated in part as follows:
H Work and Travel Time. The division director or a member of his staff to whom such authority is delegated should determine whether travel of wage board employees is to be regarded as compensable work. The following guides will be used in making such determinations:
1 Reporting for Work. Ordinarily, where a job continues indefinitely or for an extended period of time and suitable living accommodations are available at or within commuting distance, the employees will report for work and return home on their own time.
2 Routine Travel. When employees are engaged in routine travel such as that involved in going to an outlying project or in mailing a change in headquarters where no special strain or exertion is involved, they shall be paid travel time up to a maximum of 8 hours in any calendar day. Such compensation may be paid only for travel performed during hours of the employee’s usual daily tour of duty. (Employees who do not have a regular-scheduled tour of duty may be paid for time spent in routine travel up to a maximum of 8 hours in any calendar day, including Sundays and other non-workdays.) When travel performed and computed under these conditions, plus actual worktime, exceeds 40 hours per week, the hours in excess of 40 per week shall be paid for at the overtime rate.
3 Travel Compensable as Work. Under certain circumstances, time spent in travel to or from a job may be classed as duty and may be compensated on the same basis as other work. This would include travel within headquarters where (a) employees report to a central point and are transported to the work site in a Government-provided vehicle, or (b) travel to emergency jobs such as firefighting where the travel is performed under considerable strain. In the latter instance travel to and from such a job will ordinarily be classed as work and paid for as such. In the former case the employee’s travel one way will usually be classed as duty and paid for as such.
*385 43. On March. 22,1965, the above-quoted subpart 3 of this regulation was amended to read:
3 Travel to and/or from Work Site Compensable as Work.
a Employees Reporting to a Central Point and Transported to Work Site in Government-Provided Vehicle. In such cases, travel one way (to the work site) will usually be classed as duty and paid for as such. In those situations where, at known intervals, the departure time of the Government-provided vehicle is scheduled for earlier than the beginning of the regular daily tour of duty, the tour should be adjusted to begin with the scheduled time of departure of the vehicle (See 5 below for adjusting starting time). If travel time to the work site plus work time is in excess of 8 hours in a calendar day, the employee must be paid at the overtime rate for all hours in excess of 8. Time spent in returning to the central point is not compensable unless it occurs during the established hours of the basic tour of duty. See AM 402.1 for procedures applicable to the establishment of tours in excess of 40 hours per week.
b Employees Traveling to Emergency Jobs Such As Firefighting Where the Travel Is Performed Under Arduous Conditions. In such cases, travel to and from the job will ordinarily be classed as work and paid for as such. (See Note 2 under IV K 2a above for explanation of arduous conditions.)
44. The referenced Note 2 under IV K 2a provided:
Note 2. An example of travel carried out under arduous conditions is given in 33 CG 274, which concerns Forest Service employees assigned to a smoke-jumper forest firefighter unit. These employees, dispatched to a fire by airplane, were required to be returned to headquarters as promptly as possible after release from the fire in order to be ready for the next emergency. The only available transportation was a school bus having upright rigid seats built close together and low to the floor to accommodate school children. The forced travel over a distance of 667 miles without stopover or opportunity to rest under such uncomfortable conditions was determined by the Comptroller General to be compensable as overtime.
45. The eight plaintiffs involved in Count II of the petition were all vessel employees who operated the PIADL *386 boats between Orient Point and Plum Island. There were three boat crews, each consisting of three men (boat captain, chief engineer-marine, and deckhand). During the claim period (December 8, 1959, to December 22, 1959), duty shifts were 7:00 a.m. to 6:00 pan., and 6:00 p.m. to 2:00 a.m. on Sunday, Monday, Tuesday, and Wednesday, and 7:00 a.m. to 3:00 p.m. and 3:00 p.m. to 2:00 a.m., on Thursday, Friday, and Saturday. Only one crew was on duty at any time, which mamied only one vessel at any time. In the course of a 3-week cycle, each crew worked each shift.
46. During the claim period, and prior thereto, no specific times were designated for lunch periods although posted crew shift schedules designated either an hour or a half hour in each shift for such purposes. The half-hour periods were in the first shift on Sunday and Monday; all the other lunch periods were an hour. These employees were not compensated for such periods. The purpose of setting lunch hours in this fashion was to arrive at a 40-hour week. No specific time of any shift was set aside by the administration until December 22, 1959. Thereafter specific times were designated. This ended the claim period.
47. During the claim period, two PIADL boats were operated: PIADL I, which was a 65-foot T-boat, and PIADL II, which was a 38-foot picket boat.
The duties of the crew members were primarily connected with the boats, either in operation, maintenance, or repair. Crew members also performed other duties which took up very little of their time. They were responsible for raising and lowering the flag at the Department of Agriculture installation at Orient Point, and for unlocking and locking the gate to the parking lot there. The marine engineers were also called on to serve in the powerplant on Plum Island during an emergency, but these occasions were rare.
48. Quite often, the boats were not operating during shifts, but were docked at Orient Point or Plum Island. Between 11:00 a.m., and 2 :Q0 p.m. during the claim period, the boats were docked for periods at least as long as the designated lunch time on all but a very few days. The boats generally did not operate more than 35 hours of the 120 hours per *387 week that the crews were on duty. In .short, the operation of the boats did not interfere, except marginally, with the plaintiffs’ ability to take a work-free lunch period.
49. Maintenance and repair work on the boats consisted of such various duties as engine overhaul and repair, plumbing and oil burner work, painting, scraping paint, washing, splicing rope, and some carpentry work (by the deckhand only). This work was not performed continuously. It did not have to be performed at any particular time. It could be scheduled. In short, it was not so urgent as to require it to be performed at inconvenient times. Moreover, after the claim period, a 40-hour work week proved sufficient time for the same men to perform the same duties as well as they had performed them during the claim period.
50. Plaintiffs filed a claim with the General Accounting Office in which they sought to recover overtime compensation for the designated lunch time of the shifts during the claim period. This claim was denied by the General Accounting Office in a decision dated August 16,1963.
51. The parties have agreed that plaintiffs, employed as members of the boat crew, were wage board employees and as such were not subject to the Classification Act of 1949, as amended, (5 U.S.C. 902(c), 1958 Ed.) and accordingly are excluded from the purview of the Federal Employees Pay Act of 1945 (5 U.S.C. 901, et seq., 1958 Ed.).
52. Evidence produced by the plaintiffs tends to show that in the maritime industry it is a common practice for vessel employees to be paid for an entire shift without deduction for any time spent eating meals. However, this practice seems to refer to operations where the vessels are under way for longer periods than those involved here, and is not shown to apply in circumstances where maritime employees are almost always at dock during times designated for lunch periods.
53. On December 9, 1959, Willard Quick, secretary-treasurer of Local 333 of the National Maritime Union, wrote the Department of Agriculture, stating in part:
_ 3. Although in general it is contrary to maritime practice, we recognize that in a ferry operation, if the sched *388 ules are properly arranged, it is possible to set a definite lunch hour. To; this we have no objection. One must recognize, however, that if a man’s lunch hour is say from 1200 to 1300 hours he is perfectly free during that period of time to absent himself from his work and not be recalled, except in an emergency situation. What we are opposed to is the custom at Orient Point of scheduling the man to work for 9 hours, and then taking some 60 minute period when there is no activity and calling it lunch hour. In short, either eliminate the lunch hour, as is the common practice, or schedule a definite lunch hour and then live up to it. Actually, I think this is the position you take in Item 2 of your letter, but it is not the position nor practice of your activity at Orient Point.
54. The New London Freight Lines made the same runs as the boats operated by the plaintiffs. In the claim period, this was a year-round operation. While the New London Freight Lines employees had no deduction for time spent eating, they were not paid overtime until they had worked 12 hours a day, nor were they paid overtime after working 40 hours a week, as plaintiffs were.
55. By its amended answer, filed May 23, 1967, defendant withdrew without prejudice its counterclaim against plaintiff Arthur Sarno, advising that such plaintiff did not appear to be the same person named in the counterclaim.
Ultimate Findings or Fact
56. The duties of the plaintiff maintenance and engineering employees, and the duties of the plaintiff vessel employees were clearly such that the men did not have to work continuously throughout their shifts, and they could have easily taken and did take a %-hour or hour lunch period, as the case was with respect to each plaintiff, free of any work.
57. Plum Gut was not so rough and dangerous that the boat travel across it can be considered arduous.
CONCLUSION OK Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment *389 herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and their petition is dismissed. Defendant’s counterclaim is dismissed without prejudice.